The next case on the calendar was United States v. Cornelius. That's submitted on the briefs. And the next case up for argument is Syed Isse v. Barr, No. 17-710178. And on this case, the government will be appearing telephonically. And is he there? Yes, he is, Your Honor. Mr. Jolly? Yes. And can you hear us okay? I hear you perfectly fine. All right. Well, then we'll start with the Petitioner's Council. Good morning, Your Honors. I am Robin Carr, the attorney for Petitioner Syed Ali Isse. In the recent case of Airy v. Barr, this court articulated the firm resettlement analysis as a two-step process. First, the Department must present evidence of an offer of some type of permanent resettlement. And then second, the applicant has the burden to show that the conditions of his residence were too restricted for him to be firmly resettled. It's our position in Mr. Isse's case that the Board of Immigration Appeals erred in both parts of the analysis. First, the statute, 8 CFR Section 1208.15, says that an alien is considered to be firmly resettled. Let me stop it. That's a regulation, not a statute, right? I'm sorry? That's a regulation, not a statute, right? Right. Okay. Yeah, but in that section, which defines firm resettlement, it says that an alien is considered to be firmly resettled if prior to his arrival in the United States, he received from another country an offer of permanent resident status, citizenship, or some other type of permanent resettlement, unless one of two exceptions applies. While matter of AGG suggests that the Department may meet its burden by showing that the applicant received asylum in another country, it's our position that the court must look at the immigration laws and the refugee procedures in the foreign country to determine whether asylum in that country qualifies as permanent resettlement. At least two cases support this position, Abdullah v. Ashcroft out of the Third Circuit. Isn't there a case from this circuit, the Maharaj case, M-A-H-A-R-A-G, it's 450 Fed 3rd, 961 to 976. Doesn't that case hold that the DHS meets its initial burden by showing that the government of a third country issued to the alien a formal offer of some type of official status permitting the alien to reside in that country indefinitely? Isn't there evidence of that here insofar as the petitioner getting the section 24 permit? We don't dispute that Mr. Issei received asylum in South Africa. We just dispute that asylum in South Africa qualifies as permanent resettlement. Why doesn't it, since it allows him to remain in that country indefinitely? It doesn't allow him to remain in the country indefinitely. It gives him four years that are renewable. So why isn't four years renewable indefinitely? Well, for several reasons. First, the asylum is for a fixed term. In Mr. Issei's case, it was first for two years and then for four. But he himself concedes that it is renewable. And so therefore, if it's renewable, why isn't it an indefinite term? Because in order to renew his status, he must establish his claim again de novo. He just has to reapply. He has to reapply, but he also has to reestablish that he continues to qualify for asylum. The conditions in his home country haven't changed. That's correct. And he can lose his status if the government of South Africa determines that conditions in his country of origin have fundamentally changed such that he no longer qualifies as a refugee. So for all of those reasons... Isn't there another issue here that may avoid, you might be able to avoid that issue? That's the second one. Yeah, it's the second issue. The second part of the test. I think that's actually a hard question. The first argument that you and Judge Wu were just discussing. Well, in Abdullah v. Ashcroft, they even addressed a two-year, it appeared to be a Section 24 permit, and said that that was temporary. He got a two-year Section 22, and thereafter he got a four-year Section 24. The two-year is just simply for the application process. So he got two years for that, and then once he got that, he got four additional years under Section 24. Mr. Issei first had a six-month Section 22 permit, and then a two-year Section 24, and then a four-year Section 24. Counsel, didn't it also provide that refugees who remain in South Africa for five consecutive years may seek a permanent immigration permit? Wasn't that part of the record? They may, and that's under Section 27. A refugee who has been recognized as an asylee consecutively for five years may apply for permanent resettlement. But in that case, the Standing Committee for Refugee Affairs must certify that he will remain a refugee indefinitely, and that happens very rarely. Mr. Issei never qualified for that type of permanent resettlement. Did he stay long enough to apply for that? He did not. So we don't know if he would have qualified or not, because he elected to leave South Africa. He left because of the conditions there. Let's just assume for a moment that the government would be correct in determining that he had a permanent resettlement in South Africa. So there are some exceptions to the BAR. That's correct. And I would say as to the second part of the analysis, the court's decision in ERI versus BAR is directly on point. Well, let's talk about that. Is it directly on point? It appears that in the ERI case, we said that the agency failed to even consider the evidence that the petitioner was harassed in the country where she settled. Is that the case here, that the agency declined to even consider that evidence? Well, the court – Could you answer my question first? Did the agency in this case decline to consider the evidence of harassment? Right. The Board of Immigration Appeals declined to consider Ms. ERI's evidence that she was persecuted in South Africa. Did that happen in the case of Mr. Issei? The evidence was in the record, but I would say in the BIA's decision, the BIA misstates the respondent's argument or the petitioner's argument. But considered it, though. The argument was considered by the agency. So that makes this case a little different than ERI. Wouldn't you agree? It does, but if you look at page 11 of the appellate record, page 3 of the BIA's decision, the BIA suggests that the petitioner's main contention is that he will be limited to working at Somali-owned shops, that he will be robbed, and that he fears xenophobic violence against Somalis in South Africa. And while Mr. Issei certainly fears these things, and with good reason, Mr. Ilei's main contention is, and always has been, that he never found a safe haven in South Africa. He presented evidence of that. He was subject to persecution in South Africa. That's correct. That's exactly what the xenophobia reference is and the harassment reference is. So the Board did consider that. Well, they misstated his position, though. They made it appear as if he was making some sort of speculative, you know, he had this fear based on an understanding that Somalis face persecution in South Africa, but they didn't consider his testimony that was found to be credible, that he himself suffered that persecution. But the IJ said that the petitioner admitted that there were Somalis who started their own businesses and had peacefully continued to operate their businesses in South Africa. So it's not every single Somali business that is attacked. No, that's true. And he did testify in the IJ, based his decision on Mr. Issei's testimony, that some Somalis who face, who find peace in South Africa do remain indefinitely. But Mr. Issei's evidence was that he did not. If you look at page 134 of the appellate record, Mr. Issei testified, never did I sleep one night feeling safe in South Africa. At page 132 of the appellate record, he testified that he had very big problems when he testified, or when he lived in South Africa. But is this a subjective standard or an objective standard at this point? I would say it's an objective standard. Therefore, we would have to make a determination as to the extent to which Somali refugees or otherwise persons of Somali ancestry in South Africa are treated badly by, it's not the government by the way, it's hooligans who are basically attacking them. So that is the question of how often does that occur. Isn't that the question? Well, I guess I misstated. It would be a subjective standard because the court looks at whether the applicant found a safe haven in that country. You would have to look at his subjective experiences in that country. And I think Siong, Andrejian, and Maharaj all support that sort of standard. Let me just ask you, is there any objective evidence in the record as far as the extent to which Somali businesses are attacked by persons in South Africa on the basis of their ancestry? I would say there's both. There's both subjective and objective evidence. Let me ask, did anybody cite to the State Department's country conditions either as to Somalia or as to South Africa? We included a State Department country report from both South Africa and Somalia. But in the State Department's country report, the State Department states that South African police and immigration officials abused refugees and asylum seekers. More than 400 foreigners were killed in mob violence between 2011 and 2013. That appears in the appellate record at page 357. More than 700 foreign-owned shops were closed by police because refugees and asylum seekers operated them. And that appears in the appellate record at page 357. But the immigration judge addressed that in his decision at page 83 of the record by saying that even though there were some problems indicated in the report, that there were, the respondent conceded that there are areas of South Africa where other similarly situated Somalis have found peace in South Africa. The country condition evidence indicates that South Africa is a large country and suggests there are areas of South Africa respondent could locate to where criminal elements are not present. So the immigration judge addressed that whether or not you agree with the immigration judge's assessment of the country report. It was addressed. But Mr. Issei relocated several times and yet he continued to suffer persecution everywhere that he went. He provided corroborating evidence including a letter from I believe a Somali refugee association in South Africa and a police report to show that in the incident that prompted him to leave, he was robbed along with other workers in the shop. They were tied up. Let me ask you a question. Is there any evidence that had he worked for a non-Somali business that he would suffer persecution? In other words, he limited himself to only working for Somali shopkeepers. Had he worked in any sort of other industry or any other other than a non-Somali storefront that he would suffer any sort of persecution? Is there any evidence? No evidence one way or the other. The entire time he... Is there any evidence that Somalis who immigrate to South Africa are working in all establishments throughout South Africa? I believe the majority of Somali refugees in South Africa either operate a business, operate a shop, or work for a Somali-owned shop. That's not in the record. There's nothing to that effect in the record. One way or the other, is there? I would have to look. No, I don't know if that's in the record. But again, we're focusing on Mr. Isay's experience, not the experience of other Somali refugees. Well, in the Country Conditions Report, you referenced Somalis generally in the Country Conditions... or refugees generally in the Country Conditions Report when you were discussing that. That's correct. I talked about foreigners living in South Africa. I'm going to save some time for rebuttal. Yeah, and I would also like to address the internal relocation issue, but I can do that on rebuttal. Let's see how we go. Thank you. Mr. Jolly. Yes, Your Honor. May it please the Court, my name is Lance Jolly. I represent the respondent, the United States Attorney General. Before I start, I'd just like to thank the Court and opposing counsel for their flexibility and accommodation for allowing me to appear telephonically. As to the merits of the case, substantial evidence supports the agency's finding that Petitioner had firmly resettled in South Africa. Under this Court's approach in Maharaj, or the similar approach subsequently established in matter of AGG, substantial evidence supports the agency's finding that DHS met a threshold burden to show that Petitioner received an offer of firm resettlement. So what's the offer? Well, he was granted asylum status with the Rule 24 permit, and so in Ari, this Court implicitly found that that was sufficient for the first prong of the Maharaj approach. How long was his asylum offer good for? His latest renewal was a four-year renewal. And then? And then he could seek further renewal, or he could have sought an immigration permit to have permanent residence. Is the only critical factor that such relief is available, or does it have to be established? I think it's – in Maharaj, the Court focused that it has to be more than a mere possibility, and that you can make a – if there's an existence of a legal mechanism by which you can obtain permanent status, that would be sufficient. So the – in the government's view, the fact that he could apply or renew his asylum status at the end of, what, was it four years or five years, that that's sufficient? Yes, the renewal process, yes, and this Court in several cases has found firm resettlements where it's a renewal-type approach. Okay, so the Council argues for the exceptions. Right. That goes to the second factor of Maharaj, or the fourth factor in the Board's AGG factor. And the regulations define it as the conditions were not so substantially and consciously restricted by the government officials. And because petitioner's claim of persecution isn't because of the government officials, he would fail to meet that exception. So how do you read Seong? Seong – it recognizes – there is either a tension or an overlap. Seong recognizes that this Court has found that someone who's being persecuted hasn't firmly resettled, but it also recognizes the regulatory language. You mean it falls within the – I think it's ACFR 208.15b? Correct. The country – the conditions in his or her residence in that country were substantially and consciously restricted by the authority of the country of refugee? Correct. So doesn't Seong fit its analysis within that? Well, Seong was ineffective assistance of Council claim. And because of – Go ahead. It found that IAC – that ineffective assistance claim was valid and was – further proceedings were warranted. So doesn't that mean that if it's – if a refugee, somebody who's in the position of Mr. Ise, could show that he suffered persecution in South Africa, wouldn't that fall within the exception? If the persecution was at the hands of the government, yes. But that's not the case here. Well, you know, it's under strict asylum. You know, if you're – somebody's applying for asylum in the United States and meeting all the requirements, if there's evidence that the government couldn't control the persecutors, that's sufficient. Right. You have to show the unable or unwilling component. Right. Yeah. And isn't there evidence in the record, country conditions evidence, that Somalis in South Africa just are not accepted and that they are – they suffer persecution and the South African government has not been able to control it? There's evidence that the government has had issues. I wouldn't go so far to say that it's unable to – to the extent that it would be like a failed state. Mr. Ise never – at least the record does not show that he submitted a police report or tried to seek the police action, to my knowledge. And the record – although there's problems in South Africa with the xenophobic violence, the South African officials do something, but unfortunately it's not sufficient to protect everyone all the time. Why isn't that – for purposes of this analysis, why isn't that sufficient for him to fall within the exception? Well – I mean, does he have to make out a straight asylum claim in this context? He has to show that the official substantially and consciously restricted the conditions. All right. Well, I guess we're just going around. Well, let me ask the government counsel, isn't it a question of showing the extent of the problem? In other words, the fact that there is a problem can either be a very severe one or it could be one that's less severe. And so isn't that the issue is the extent to which this issue arises? Yeah, the unable or unwilling component does reflect how severe the non-governmental violence has to be to meet that unable or unwilling component. Then the next question is that the petitioner did submit the State Department country condition, which does address it, but from that you can't determine the extent to which it is a problem. It recognizes the problem, but the question is the extent of it. So in that situation, what's the government's position as to what we should do about that? Well, what is clear is that the record does not compel the conclusion that the South African government would be unable or unwilling to protect them. Go ahead. I guess my concern is whether or not the agency applied our law correctly. Well, the board applied the ADG framework, which wasn't challenged before the board or even before the court. And so really the court should defer to the board's approach. Whether that results in a meaningful difference, it doesn't really appear to be. If anything, the board's approach kind of separates the offer of firm resettlement part from the exception. I may have lost the question, but... All right. That's fine. Let's see if there's any other questions. No other questions. Anything else you want to address? Proposing counsel wanted to talk about internal relocation. In our answering brief, we noted that if the court gets to that question... In Somalia. What? In Somalia. Relocation within Somalia. Right. If the court has to get to that question, if the firm resettlement doesn't satisfy it, then a remand would be appropriate on the internal relocation question. Okay. Thank you for that. I'll give the petitioner two minutes for rebuttal. Thank you, Your Honors. First, the court in Arey v. Barr relying on Siong v. United States, or v. INS, held because of the evidence that Ms. Arey may not have found a safe haven from persecution in South Africa, she established at least a plausible claim that she was not firmly resettled in South Africa. Mr. Isse provided a basis as strong or stronger than the petitioner, Ms. Arey, that he suffered persecution in South Africa and, at a minimum, that he never found a safe haven there. I don't know that he's required to establish a traditional claim for asylum. I don't know that he has to show that he was persecuted in South Africa. He has to show that he never found a safe haven there. Well, no, I think he has to meet the standard under the reg, which is the conditions of his or her residence in that country were substantially and consciously restricted. By the authority of the country of refuge. So there has to be some connection. And there is. And according to Siong, Andre Asian, and Maharaj, he can satisfy that by showing that he did not find a safe haven in the country where he had asylum. I don't understand. When you say he has not found it, but if other people find it, other Somalis find it, the mere fact that he doesn't, but other Somalis do, don't you consider that in the calculus? Why is it just him? In other words, he didn't find it, arguably, under his own testimony. But if other Somalis do, how does that affect the determination? I think the focus of the firm resettlement bar is on whether the applicant himself found a safe haven there. But there has to be at least some imprimatur of the government or something systemic about the failure to permanently resettle. It just can't be a criminal element that's making it difficult for him, can it? No, and there was evidence in this case that would probably establish that he suffered persecution in South Africa. On the part of the government of South Africa? And by elements that the government is aware of and does nothing to stop. What evidence was there in the record about that? He testified that in the first incident, in the first year that he lived in South Africa and he was working at the Somali-owned shop, they were robbed at gunpoint numerous times and that the perpetrators told them that you're foreigners in this country, you need to leave. You don't belong here. Okay. May I briefly address the internal relocation issue? I think the government's conceded that if they don't win on that issue, we should remain. Remain. Okay, thank you. Okay, thank you, counsel. The other two cases on this morning's calendar, let me back up. ESA will be submitted at this time. The other two cases on this morning's calendar, Aiden v. Barr, Mohammed v. Barr, are also submitted on the record, and that ends our session for today.
judges: Paez, Rawlinson, Wu